NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| DONIELLE T. HOIST, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 12-5370 (FLW)(LHG) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STATE OF NEW JERSEY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, District Judge**:

*Pro se* Plaintiff Donielle Hoist ("Plaintiff" or "Hoist") was employed by Defendant the New Jersey Department of Environmental Protection ("DEP," or, with the State of New Jersey, "Defendants") until April 2011, at which time she was allegedly terminated for "conduct unbecoming an employee" after an altercation involving a coworker. Plaintiff instituted this suit against Defendants, alleging that her termination was based upon race and gender discrimination, and retaliation for engaging in protected employment activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Before the Court are motions for summary judgment brought by Defendants and Plaintiff.[1] Also before the Court are three motions to compel certain documents from Defendants. For the reasons set forth herein, the Court DENIES the motions to compel, GRANTS Defendants' motion in its entirety and DENIES Plaintiff's motion for summary judgment.

---

[1] Plaintiff has also moved for an extension of time to file her summary judgment motion. [ECF No. 71.] This motion is granted, and Plaintiff's later-filed motion for summary judgment will be considered timely.

## I.    **Background**

The following facts are undisputed unless otherwise noted.  Hoist is an African American female who, at all times relevant to this action, was employed by the DEP as a Senior Clerk Typist in the Office of Record Access ("OPRA").   *See* Defendants' Statement of Uncontested Material Facts ("DSUMF") ¶ 8.  Hoist was directly supervised by Evelyn Molder, an African American female who formerly was the Supervisor of Operations at OPRA, and Wayne Grennier, a Caucasian male who is the Supervisor of Operations at OPRA.  Molder and Grennier were supervised by Matthew Coefer ("Coefer"), a Caucasian male who is the Chief Records Custodian at OPRA.  *Id.* at ¶ 9.

Plaintiff Hoist's Workplace Violence Complaints

On March 3, 2007, Sandra Remboske filed a Workplace Violence Complaint against Hoist alleging that Hoist got very close to her, pointed a finger in her face, and began yelling profanity.  *See* Certification of Kathryn E. Duran ("Duran Cert.") Ex. C at HOIST.LR.REMOVAL 0047-52.  Ms. Remboske's Workplace Violence Complaint was substantiated and Plaintiff was issued a record of counseling on March 30, 2007.  *Id.* at 0045.

On March 4, 2010, Coefer filed a Workplace Violence Complaint against Hoist on behalf of the "Office of the Records Access Staff," which consisted of Kristina Clayton, Trisha Bibji, Ms. Remboske, Mike Williams, Evelyn Molder, Anne Hartnagel, and Maria Cantres.  The Complaint describes Hoist's allegedly poor treatment of the other members of the OPRA staff, including "nasty verbal & written correspondence, mannerisms, and body language."  Duran Cert. Ex. D at HOIST.COEFER 0064.   In general, Coefer was told by the other members of the staff that Hoist was "nasty to staff, disrespectful, does not take ownership of mistakes, not

approachable, and sometimes blames others for work errors." *Id.* at 0062, 0063, 0064.  Coefer

filed this Complaint upon the instruction of the Office of Labor Relations (the "OLR"), who

advised Coefer to fill out the form after Coefer informed them that he was collectively

approached by the staff members regarding Hoist and the alleged hostile work environment

created by Hoist.  Duran Cert. Ex. E at HOIST.COEFER 0189.

Ms. Clayton, a Caucasian female and co-worker of Hoist, also filed a Workplace

Violence Complaint against Hoist on March 4, 2010.  Ms. Clayton alleged that Hoist addressed

the OPRA staff with "nasty verbal and written correspondence, mannerisms and body language."

Duran Cert. Ex. F at HOIST.WPV.CPMP 0069-70.  The OLR found that the incident did not

constitute violence in the workplace, but served Hoist with a written warning reminding her that

she must conduct herself "in a courteous and professional manner at all times with both co-

workers and [her] manager."  Duran Cert. Ex. G at HOIST.LR.REMOVAL 0041.  The OLR

warned Hoist that future incidents of inappropriate behavior may result in disciplinary action.  *Id.*

On March 23, 2010, Hoist verbally complained to Coefer about several incidents where

Ms. Clayton was allegedly making rude gestures and acting unprofessionally towards Hoist.  *See*

Duran Cert. Ex. H at HOIST.WPV.COMP 0028; Deposition of Donielle Hoist ("Hoist Dep.") at

39-41, 51:9-19.  Hoist alleges that Coefer did not take action in response to these complaints, and

instead filed a Workplace Violence Complaint on behalf of Ms. Clayton against Hoist.  On May

4, 2010, Hoist filed a Counter-Workplace Violence Complaint against Ms. Clayton alleging the

same incidents she verbally reported to Coefer, and against Coefer for failing to take any action

based on her verbal complaint to him on March 23, 2010.  *See* Duran Cert. Ex. H.  Hoist testified

that this Complaint was a Counter-Workplace Violence Complaint to the ones previously made

against her on March 4, 2010, by Ms. Clayton and Coefer on behalf of certain OPRA staff members.  *See* Hoist Dep. 42:7-25.

After an investigation into Hoist's Workplace Violence Complaint against Ms. Clayton and Coefer, the OLR determined that the incidents relating to Ms. Clayton alleged by Hoist did not constitute violence in the workplace, but did create a hostile work environment.  The OLR served Ms. Clayton with a written warning, and reminded Ms. Clayton to conduct herself in a courteous and professional manner in the future or else she may be subject to disciplinary action.  Duran Cert. Ex. I at HOIST.WPV.COMP 0001.  The findings, therefore, in both Ms. Clayton's and Hoist's Workplace Violence Complaints were the same, and thus, the action taken in regard to both Hoist and Ms. Clayton was the same.  *Compare* Duran Cert. Ex. I, *with* Duran Cert. Ex. G.

The determination letter sent to Coefer reminded him that as a manager he needed to better address these types of incidents with staff and that his meeting with the OLR would serve as counseling. *See id.* at HOIST.WPV.COMP 0022.  Coefer disputed the determination letter findings, and responded that he did address the incident with both Hoist and Ms. Clayton individually, as he believed a meeting between the three of them would be inappropriate while OLR was still investigating the Workplace Violence Complaint against Hoist.  *See* Duran Cert. Ex. J.

<u>Record of Counseling in September 2010</u>

On September 15, 2010, Hoist arrived at work at 9:30 a.m. and, after learning that she would be the only employee working the first desk that day, used "inappropriate, obscene, and offensive language" and slammed objects on her desk.  *See* Duran Cert. Ex. M.  Ms. Clayton relayed her observation of the incident to Coefer in an electronic communication on September

20, 2011.  According to Ms. Clayton, Hoist stated, "Fuck this why am [sic] always left alone, I am tired of this, People always wondering what Donielle doing [sic] but no one else is checked, I am considerate to everyone I even came in today even though I was sick, think I am playing I am leaving early today."  *Id.* at Ex. N, at HOIST.LR.REMOVAL 0077.  Hoist was issued a Record of Counseling for this incident on September 21, 2010.  *Id.* at Ex. M.  Hoist confirmed that she "reacted poorly" and did in fact have a negative reaction and slammed items on her desk.  Hoist denies, however, that she used offensive language.  Hoist Dep. 78:15-23.  Other emails from co-workers present during the incident confirm both the incident and assert that Hoist used offensive language.  Duran Cert. Ex. N, at HOIST.LR.REMOVAL 0077-79.

<u>One-Day Suspension in November 2010</u>

On November 29, 2010, Coefer assigned Hoist a priority task to take checks down to the mail room.  Hoist walked into Coefer's office and informed him that she would not take the checks down until "all the processes are completed."  When questioned what additional steps were needed, Hoist told Coefer that he should know, said she was taking a break, walked out of his office, and refused to return to the office when Coefer requested she do so.  *See id.* at Ex. K.  Hoist confirmed that this was the substance of the encounter.  Hoist Dep. 58:8-29.  Hoist was disciplined for insubordination and received a one-day suspension.  Duran Cert. Ex. K.  Hoist testified that she appealed this discipline but the appeal was still pending when she was terminated.  Hoist Dep. 56:19-57:4.

Hoist believes that this constitutes "disparate treatment" because on March 18, 2010, Doug Daniels and Coefer were having a closed-door meeting when Mr. Daniels threw open the door and stormed out of the office, yelling.  Mr. Coefer asked him to come back but he refused.  Hoist does not believe that Mr. Daniels was ever disciplined.  *Id.* at 54-55.  Mr. Daniels is an

African-American male, who worked for site remediation, whom Coefer supervised at the time of the incident. *Id.* at 52:13-55:14. Coefer affirms that he did not treat Hoist differently from Mr. Daniels or any other individual. *See* Certification of Matthew Coefer ("Coefer Cert.") ¶ 3, *located at* Duran Cert. Ex. L.

<u>Other Incidents with No Record of Discipline</u>

In November 2010, Hoist was the safe-keeper and in charge of logging all the money and checks that were received in the OPRA office. The safe was located in Hoist's cubicle area. *See* Hoist Dep. 34:20-23. On November 5, 2010, Hoist arrived at the office to find that the safe in her cubicle was opened and that the contents of the safe had been removed. Hoist was concerned that the contents had been stolen and that she would be blamed. *See id.* at 35. She testified that, at the time of the incident, only she and Coefer had keys to the safe. *See id.* at 34: 23-25. Sher further testified that she saw Coefer in the office for a short period that morning, despite the fact that he was scheduled to be on vacation. *Id.* at 35:7-10. She then learned that the contents of the safe were fine and in the possession of her supervisor, Mr. Grennier. *Id.* at 35:11-13. She was never blamed for anything being missing from the safe and was never disciplined regarding the contents allegedly being removed from the safe on November 5, 2010. *Id.* at 37:14-25. Following this incident, Hoist asked to be removed from safe duty. This request was approved. *See id.* at 34:2-8.

On November 16, 2010, Coefer called Hoist into this office to speak with her about a visitor who was left unattended in the lobby. Hoist testified that she attempted to assist the individual and followed procedure. She further testified that she was unable to help the visitor because he "was not of a concern to the office." Hoist Dep. 94-98. Because Hoist feared that Coefer was going to discipline her for her failure to assist the visitor, she terminated the meeting

6

and called her union representative.  *Id.* at 95-98:4.  Hoist's union sent an electronic communication to Coefer regarding the incident and Coefer explained that he did not intend to discipline Hoist for the incident, but merely wanted to talk to her about it and discuss how such a situation should be handled.  Duran Cert. Ex. O.  While Hoist testified that she had been disciplined for the incident, *see* Hoist Dep. 98:5-7, there is no record of Plaintiff being disciplined, and the OLR and Coefer affirmed that she had not been disciplined.  *See* Certification of Jason Strapp ("Strapp Cert.") ¶ 2, *located at* Duran Cert. Ex. L; Coefer Cert. ¶ 2

On December 7, 2010, Hoist alleges that she was called into Coefer's office regarding her failure to respond to an inquiry Coefer had previously made of her regarding a "requestor." When she pulled up the request in the system, she found that the request was still being processed so she determined that it was a program technician's job to address and contact the requestor.  Because Hoist believed it was not in her job description to contact the requestor, she did not do so.  *See* Hoist Dep. 105:21-106:12.  Coefer, however, informed Hoist that he only wanted to know the specific documents the requestor was looking for from their office.  *Id.* at 106:13-20.  Hoist was never disciplined for this incident.  *Id.* at 108:9-17.

Request to Change Working Hours

On June 3, 2010, Hoist requested to change her working hours.  *See* Hoist Dep. 69:24-70:11.  She testified that her request was denied, but that she believed a Caucasian female co-worker was permitted to change her hours on the same day she requested a change.  *See Id.* 69:13-21, 70:23-25, 71:1-24.  An electronic communication between Hoist and Grennier on June 3, 2010, however, shows Hoist's request to change her hours was actually approved.  *See* Duran Cert. Ex. X.

Plaintiff's Engagement in Supportive Services

As a result of the OLR's investigation and findings regarding the Workplace Violence Complaints that Hoist had filed in May 2010, the OLR offered Hoist supportive services. Initially, she was offered a meeting to discuss the workplace issues with OLR, her union representative, and Coefer. Plaintiff, however, refused to attend such a meeting, explaining that "things have arisen that [have] brought on more stressors." Duran Cert. Ex. T. The OLR, therefore, offered to schedule an appointment for Hoist to see a psychologist, Dr. Lawrence Straus, as an alternative supportive service. *See id.*

Plaintiff eventually met with Dr. Straus on October 5, 2010. During her consultation with Dr. Straus, Hoist stated that she feels that Coefer "shows favoritism to others and that he picks on her." Duran Cert. Ex. U, at HOIST.LR.REMOVAL 0096. Hoist also stated that she feels Coefer is inconsistent with his approach with her, and that she needs Coefer "to be more understanding . . . I'm different." *Id.* She stated that she is not sociable at work, and that Coefer should accept that she can be withdrawn. She told Dr. Straus that she gets emotional easily, and that she finds it "hard to talk civilized when I'm upset," which is why she avoided meeting with Coefer. *Id.* She also stated that she was afraid of getting angry in the workplace, which is why she avoids discussions. *See id.*

Dr. Straus reported that their discussion "looked at her personal issues and what causes her to become emotional and then shut down," as well as "how she can build tolerance for emotional situations; cope with 'feeling boxed in,' and how not to 'run' from situations." *Id.* at 0097. Dr. Straus recommended that Hoist seek counseling to deal with these issues, and that Hoist agreed to meet with Coefer, but that she wants them to be more understanding of her. *Id.* With regard to Coefer, Dr. Straus stated that "it would help if Coefer could be more understanding of her triggers, more patient, and more sensitive. And if there is any kind of

double standard in his managing style (rather than this is Hoist's sensitivity and misperception here), then that should be addressed." *Id.* Dr. Straus also reported that he believed Coefer would benefit from a discussion with him regarding how to work with Plaintiff. *Id.* Dr. Straus then met with Coefer on December 1, 2010, to discuss how to better work with Hoist and understand her triggers. *See* Duran Cert. at Ex. V.

Plaintiff's Attempts to Transfer

Around the time that Hoist filed her Workplace Violence Complaint against Ms. Clayton and Coefer, she applied for a lateral transfer out of OPRA, but the transfer was never completed. Hoist Dep. 112-14. Specifically, Hoist applied for a transfer in the "lateral mobility process," and was given equal consideration with all other employees requesting a transfer. *Id.*; *see also* Duran Cert. Ex. Q. During this time, Hoist's union also requested that Hoist be transferred out of OPRA due to the environment of the workplace. *See* Hoist Dep. 112:24-113. This was not the first time Hoist had tried to tried to transfer; rather, Hoist testified that she had been attempting to transfer out of OPRA since 2009. *See* Second Deposition of Donielle Hoist ("Hoist Second Dep.") 29:3-18.

Coefer tried to help Hoist in her request to transfer. He sent an electronic communication to Magdelena Padilla, a Human Resources employee, on September 21, 2010, requesting information regarding how to help Hoist transfer from the OPRA office because Hoist was unhappy in the office "for quite some time." Duran Cert. Ex. Q at HOIST.GRENNIER 0150. In November 2010, Coefer sent an electronic communication to Debra Ewalt, the Director of Human Resources, requesting that Hoist receive expedited consideration for her request for a lateral transfer to another office. Coefer explained that he believed expedited consideration to be necessary because Hoist was extremely unhappy in OPRA, and her unhappiness was "appearing

more and more in her daily behaviors and affecting her moods and the moods of her coworkers." *Id.* at HOIST.GRENNIER 0148.  Coefer expressed that he was "worried that there will be disciplinary issues or the creation of a hostile work environment if she continues to remain in the office." *Id.*  In her response, Ms. Ewalt explained that she had no authority to expedite the process, but that Hoist's request for a transfer would be given "equal consideration." *Id.*  Neither management nor Hoist's union ever told Hoist that she would be transferred; rather, Hoist had simply made the request.

On January 20, 2011, Hoist was removed from work by her private psychiatrist, Dr. Wyoming Ye, due to major depressive disorder and "unfavorable working environment."  Hoist Dep. 119:16-21; Hoist Second Dep. 31-33.  Hoist testified that she was scheduled to return to work on February 22, 2010, but Dr. Ye took her out of work again because she had not been transferred.  *See* Hoist Dep. 111:5-20.  Hoist testified that she returned to work against her doctor's orders on March 22, 2011, because she could no longer afford to be out of work without pay.  *Id.* at 111:21-112:8.  In March 2011, Hoist sent a letter to Coefer asking to "reset the clock" so that they could all work together again.  Hoist conveyed that she wished to "eliminate all the unprofessionalism" in the office, and have the office instead focus on getting their jobs done.  *Id.* at 115:5-116:22; *see also* Duran Cert. Ex. R.

After Hoist sent this letter, she was contacted on April 13, 2011, via electronic correspondence from Veronica Kirkham, an employee of the OLR, who attempted to set up a meeting with Hoist and her union representative to discuss reducing the pending one-day suspension from the November 29, 2010 incident to an official reprimand.  *See* Duran Cert. Ex. S, at HOIST 299-300.  While Hoist initially agreed to this meet, she later changed her mind and cancelled the meeting.  *Id.* at 299.

<u>2010 Performance Evaluation</u>

In 2010, Hoist received her performance evaluation ("PES"), which evaluated her performance as a senior clerk typist.  As part of the PES, she received an interim evaluation and a final evaluation.  Hoist was rated by her immediate supervisor, Evelyn Molder, an African-American female.  *See* Duran Cert. Ex. W; *see also* Hoist Dep. 85:2-12.   Coefer reviewed the PES.  *See* Duran Cert. Ex. W, at HOIST LR. PES. 11-1-10-000007.  Overall, Hoist received a "Satisfactory" evaluation.  Duran Cert. Ex. W, at HOIST LR. PES. 11-1-10-000008, 0000014. In her PES, however, Hoist received a failing grade in "Organizational Citizenship," which relates to the "[e]xtent to which employee contributes to a productive and harmonious working environment by acting in a respectful manner towards people in the workplace."  *Id.* at 000006. In the section of the interim PES relating to justifications for the PES evaluation, the report explained:  "Donielle is an efficient worker who completes her assigned tasks. She supports the Department with being compliant with OPRA.  Donielle must be more respective and courteous to fellow co-workers and staff when dealing with them on different issues or 'bad days.'"  *Id.* at 000008.

On April 30, 2010, after receiving her PES interim report, Hoist wrote an addendum to the PES.  In this addendum, she states that the "comments and accusations" about her in the PES relate to her personality, which is different from others in her work area.  *Id.* at 000010.  She states that she is more private than her co-workers, and "may seem withdrawn to them at times."  *Id.*  She states that others "going through a lesser ordeal than [she] . . . will get a more favorable and understanding treatment."  *Id.*  She states that she believes "in respect to get respect," and

that she has not been respected by her colleagues, and that her supervisors have not helped with their intervention.  *Id.* at 000011.  Hoist states that it "seems that there is an attack on me from my supervisor, as well as a demeaning of character continually on my [PES]," which she thinks could hurt other job opportunities for her.  *Id.*  She states that her supervisor has filed a complaint against her based on comments from her coworkers about "said disrespect," but that the OLR found that she did not act "in violation of the any said or unjust reasons made by my immediate supervisor…or the respected persons involved."  *Id.*  She states that her supervisor still makes comments about her behavior.  *Id.*

On May 3, 2010, Coefer responded to her addendum, and explained that he decided to give Hoist an unsatisfactory score in "Organizational Citizenship," and the "Justification for Interim Evaluation" because of "the episode this period where 37% of the Office of Record Acess employees were tired of the treatment they receive from [Hoist]" and that he was required to submit a complaint to the OLR "[b]ased on their expression of a 'Hostile Work Environment.'"  *Id.* at 000013.  On November 15, 2010, Coefer redacted his response to Hoist's addendum to remove the language referencing the Workplace Violence Complaint that he submitted.  *Id.* at HOIST.PERS. 0193.

On December 13, 2010, Hoist filed a Union Grievance against Grennier, alleging a violation of the Union contract because of her 2010 PES.  While some of the language that she disagreed with was taken out—specifically, the language referencing the hostile work environment—Hoist still disagreed with some of the wording in the PES.  *See* Hoist Dep. 102:23-103:11.  Hoist had a meeting with her union representative and Grennier on or about November 23, 2010, at which she felt Grennier did not treat her "with respect and common dignity" as required under the union contract.  *Id.* at 103:22-25.  Hoist filed the grievance against

Grennier because of "his manner in which he handled and addressed me and my union representative" in this meeting, and that she felt like he was "challenging" her and her union representative during the meeting.  *See id.* at 101:17-23; 104:14-22.

Record of Counseling in January 2011

On January 3, 2011, Hoist sent an electronic communication to Grennier, her immediate supervisor, informing him that she would be taking her half-hour lunch break at 4:00 p.m. and leaving for the day.  *See* Duran Cert. Ex. Y.  Hoist sent this electronic communication at 4:00 p.m., and then immediately left for the day.  Hoist Dep. 62:4-16.  In doing so, Hoist was in violation of DEP's Policy and Procedure No. 2.20, Section V, paragraph 2(d) & 2(f), which mandates that that an employee may not modify his or her work schedule without supervisor approval.  *See* Duran Cert. Ex. Y, at HOIST LR 00001.  On January 4, 2011, Hoist received a Record of Counseling for leaving work early the day before without prior approval.  *See id.*

Incident on April 21, 2011

On April 20, 2011, Hoist left work early.  Her supervisor, Grennier, approved her leaving early.  *See id.* at 120:25-121:6.  The next day, on April 21, 2011, Hoist received an electronic communication from a co-worker, which stated that Ms. Clayton had inquired about Hoist's whereabouts after Hoist had left early the day before.  *See id.* at 120-21.  Hoist went over to Ms. Clayton's cubicle area to question her about her inquiry.  Hoist testified that she asked Ms. Clayton, "Are you Matthew J. Coefer or Wayne Grennier?"  *Id.* at 122:7-10.  She states that Ms. Clayton replied that Hoist documented what she did with her day.  Hoist then testified that she told Ms. Clayton that if she kept "this up" she would file another hostile work environment claim against her.  *Id.* at 122:11-20.  According to Hoist, Ms. Clayton then called her a "bitch," to which Hoist responded, "If you see a bitch, slap a bitch."  *Id.* at 122:21-123:20.  Hoist testified

that she repeated this several times.  *Id.*  Hoist testified, "People just don't call people bitches and just – it's just too derogatory, so it's a slang term that we use . . . ."  *Id.* at 127:7-11.  She explained that the term "means that if you see a bitch, you smack a bitch, meaning you just don't say that unless you're going to maybe get physical . . . ."  *Id.* at 128:8-11.

Due to the altercation, security was called.  Hoist and Ms. Clayton both gave statements to the police.   In her written statement, Ms. Clayton asserts that Hoist questioned her about her inquiry regarding Hoist's early departure from work the day prior.  Ms. Clayton confirmed that she did so, and states that Hoist then threatened to have her social security card erased and called her a "snitch."  Ms. Clayton states that she then told Hoist that she was "nothing but a bitch," at which point Hoist screamed in Ms. Clayton's face, "If you see a bitch, slap a bitch."  Ms. Clayton screamed back at Hoist to "get out of my face," at which point they were separated.  *See* Duran Cert. Ex. Z, at HOIST.LR.REMOVAL 0061.

Numerous witnesses confirmed that Hoist yelled at Ms. Clayton.  *See* Duren Cert. Ex. AA.  One co-worker stated that Hoist approached Ms. Clayton, and that she heard Hoist mention Ms. Clayton's social security card, that Ms. Clayton then called Hoist "the B… word," and that Hoist then "got in [Ms. Clayton's] face, they were yelling at each other."  This coworker stated that she believed it would have escalated into a physical altercation if they were not separated.  *See* Duran Cert. Ex. Z, at HOIST.LR.REMOVAL 0064.  Another co-worker stated that Ms. Clayton called Hoist a "bitch," that Hoist then kept yelling, "If you see a bitch, slap a bitch," that Ms. Clayton was sitting and Hoist was standing and yelling in her fact.  *Id.* at 0066-67.  Another co-worker stated that she was bringing a visitor to their area when she heard both women yelling, and that Hoist was leaning in towards Ms. Clayton.  *Id.* at 0068.  A visitor to the office that morning stated that Hoist "appeared very aggressive and invasive of the personal space of [Ms.

Clayton (at one point she was approximately six inches away)," and that she expected the situation to get physical. *Id.* at HOIST.LR.DISCOVERY.REMOVAL 000003. Grennier reported that he heard Hoist and Ms. Clayton yelling back and forth from his cubicle, and that Hoist was leaning in towards Ms. Clayton, who was yelling to "get out of my face." *Id.* at HOIST.LR.REMOVAL 0069-70.

Criminal charges were not filed as both declined to press charges. *See* Hoist Dep. 124:16-125:4. Mr. Grennier advised both Hoist and Ms. Clayton that they could go home if they so wished. *See* Hoist Dep. 124:6-9; *see also* Duran Cert. Ex. Z at HOIST.LR.REMOVAL 0069. Later, Deborah Figueroa, a representative of the OLR who was handling the incident, advised Grennier that Hoist may leave and Ms. Clayton should stay unless she wanted to leave. *See* Duran Cert. Ex. Z at HOIST.LR.REMOVAL 0069. Hoist went home and Ms. Clayton stayed at the office. According to Hoist, before she was able to leave, Ms. Figueroa approached Hoist and told Hoist to come with her. Hoist refused to go without her union representative. Hoist then called her union representative, who told her not to go with Ms. Figueroa and to go home like Mr. Grennier suggested. *See* Hoist Dep. 124:14-126:13.

On April 29, 2011, Hoist received an Amended Preliminary Notice of Disciplinary Action and the Hearing Officer's Pre-Suspension Hearing Report, informing her that she was suspended immediately without pay because of the April 21 incident with Ms. Clayton. *See* Duran Cert. Ex. AA. At the pre-suspension hearing, the hearing officer determined that the following took place: (1) Hoist initiated the exchange by approaching Ms. Clayton; (2) Hoist called Ms. Clayton a "snitch" and threatened to "erase" her social security card; (3) Ms. Clayton asked Hoist if she was threatening her, to which Hoist replied she was. At that point, Ms. Clayton first used the term "bitch" while referring to Ms. Hoist; (4) Hoist leaned in to Ms.

15

Clayton's personal space and yelled, "If you see a bitch, smack a bitch" several times, essentially inviting her to physically retaliate; (5) Ms. Clayton yelled several times for Hoist to get out of her face; (6) several co-workers and outside venders witnessed the exchange; (7) the state police were called because it was feared that the altercation would progress to physical violence; and (8) they were separated and Ms. Hoist was told to go home. *Id.* at HOIST.LR.REMOVAL 0005. Based on these findings, the hearing office decided to uphold the Department's request to immediately suspend Hoist without pay, pending her disciplinary hearing, because "the level of tension remains very high between Ms. Hoist and Ms. Clayton, and it is possible that Ms. Hoist may again react/behave in a threatening and unacceptable manner towards Ms. Clayton." *Id.*

Hoist's disciplinary hearing was held on July 6, 2011, and her removal was upheld. *See* Duran Cert. Ex. BB.  Upon the conclusion of the hearing, the hearing office determined, based on the testimony and evidence presented, that Hoist's conduct had violated N.J.A.C. 4A:2-2.3(a)(6), for conduct unbecoming of a public employee, and recommended that Hoist be terminated. *See id.* at HOIST.LR.REMOVAL 0124-25.  Specifically, the hearing officer found that there was no evidence that Ms. Clayton had made an issue of Hoist leaving early the day prior, and that Ms. Clayton's inquiry as to Hoist's whereabouts was not inappropriate.  The hearing officer found that Hoist instigated the altercation by walking over to Ms. Clayton and calling her a "snitch" as she approached her. *Id.* at 0125.  While the hearing officer found that Ms. Clayton's conduct was also inappropriate, the officer concluded that Hoist should have reported the incident to OLR and walked away.  Rather, the hearing officer found that Hoist approached Ms. Clayton while she was sitting, and then proceeded to repeatedly yell, within inches of Ms. Clayton's ear, "see a bitch, slap a bitch," which could have potentially provoked Ms. Clayton into a physical confrontation. *Id.*  The hearing officer concluded: "Ms. Hoist tends

to blame others for her behavior and needs to take responsibility [for] the consequences of her actions." *Id.*

By correspondence dated July 28, 2011, Debra Ewalt, the Director of Human Resources, informed Hoist that the hearing officer's report was upheld, and she was officially terminated as of April 27, 2011. *See id.* at 0131. As a result of the April 21, 2011 incident, Ms. Clayton received a written warning for her use of language during the altercation. *See* Strapp Cert. ¶ 3.

## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Williams v. Borough of West Chester*, 891 F.2d 458, 459–60 (3d Cir. 1989)

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court will not "weigh the evidence and determine the truth of the matter" but will determine whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (internal quotation marks omitted).  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   Discussion

Both Hoist and Defendants have moved for summary judgment on Plaintiff's claims.  In her Third Amended Complaint ("TAC"),[2] Plaintiff brings six counts: "race/gender discrimination"; "wrongful termination"; "retaliation"; "hostile work environment"; "harassment"; and "disparate treatment."  Because Hoist clearly states in her TAC that these claims are being brought under Title VII, *see* TAC at 2, the Court analyzes them as such when considering these summary judgment motions.

### A.   Motions to Compel

Before turning to the pending motions for summary judgment, the Court take a moment to address Plaintiff's pending motions to compel.  [*See* ECF Nos. 72, 73, and 79.]  Two of the documents that Plaintiff moves to compel as part of her Motions, a memorandum prepared by Matthew J. Coefer ("the Coefer Memo") and a letter prepared by Rosanne Rossi ("the Rossi Letter"), *see* Pl's Br. 1-2, ECF No. 72; Pl.'s Br. 1-2, ECF No. 73, appear to have been produced. Defendants concede they inadvertently withheld the Coefer Memo from production and they committed to immediately provide it.  *See* Defs.' Opp. Br. 2, ECF No. 74.  Defendants assert that

---

[2] While Plaintiff's initial Complaint was against the State of New Jersey, the DEP, Debra Ewalt, Rosanne Rossi, Veronica Kirkham, Karen Sondej, Matthew Coefer, and Wayne Grennier, her TAC names only the State of New Jersey and the DEP.

the Rossi Letter was already produced, and was in fact attached as an exhibit to their Motion for Summary Judgment. *Id.* Plaintiff's request for relief as to both the Coeffer Memo and the Rossi Letter is therefore denied as moot.

Plaintiff also seeks an email from Dr. Lawrence Straus ("Straus Email") insofar as it pertains to her. *See* Pl.'s Br. 1, ECF No. 72. Defendants object that the Straus Email is confidential and does not relate to Plaintiff, but rather deals with treatment of Matthew Coeffer. *See* Defs.' Opp. 2, ECF No. 74. The Court finds that the Stauffer Email has been properly withheld based on confidentiality and lack of relevance, and denies this request.

Plaintiff's Third Motion to Compel seeks certain communications regarding Plaintiff's complaints between the various offices of the DEP and a senator. *See* Pl.'s Br. 2, ECF No.79. Defendants confirm there are no responsive documents. *See* Defs.' Opp. Br. 2, ECF No. 81. Accordingly, the Court denies Plaintiff's request.

Finally, Plaintiff seeks documents related to employee complaints as to various DEP personnel. Defendants oppose this application on a number of grounds, including that the request was not made during the discovery period or raised during the parties' meet and confer process, that the documents are not relevant, and that they include privileged and confidential records. *Id.* Despite nearly seven months for discovery and a direct order to meet and confer, Plaintiff failed to request this information. At this point it is simply too late; the Court denies Plaintiff's request for employee complaints. Accordingly, Plaintiffs' three motions are denied.

### B.    Alleged Tort Claims

In her moving papers, Plaintiff indicates the possibility of causes of action other than those arising under Title VII; in particular, she makes mention of various other tort claims, including intentional infliction of emotional distress and defamation. Even if Plaintiff did intend

to bring such tort claims—which are not alleged in her TAC—such claims must be dismissed because Hoist has not complied with the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1-1, *et seq.* Under New Jersey law, tort actions against public entities and public employees are governed by the Tort Claims Act, which requires persons who have claims against public entities or their employees to provide notice to the parties within ninety days of accrual of such claims. See N.J. Stat. Ann. § 59:8-8. Leave to file a late Notice of Claim may be obtained only by motion and for good cause shown within one year of the date of the accrual of the claim. *See id.* § 59:8-9. After this one year period has expired, the court lacks jurisdiction to permit the filing of an untimely Notice of Claim. *See Iaconianni v. New Jersey Turnpike Authority*, 236 N.J. Super. 294, 298 (App. Div. 1989). The filing of a civil complaint is not a substitute for filing a Notice of Claim, even if the complaint was filed within the 90-day or one-year period. *See Guzman v. City of Perth Amboy*, 214 N.J. Super. 167, 171-72 (App. Div. 1986). In other words, failure to satisfy the notice requirements of the Tort Claim Act is an absolute bar to recover against a public entity or its employees. *See* N.J. Stat. Ann. § 58:8-9.

Here, because Hoist's references to intentional infliction of emotional distress and defamation sound in state tort law, Hoist was required to file a Notice of Claim. *See, e.g., Velez v. City of Jersey City*, 180 N.J. 284, 293 (2004) (holding that the Tort Claims Act's notice requirements apply to both negligent and intentional torts). Hoist does not deny that she failed to file a TCA notice; rather, she requests the Court to allow her to "make that appropriate correction." See Pl.'s Reply Br. at 3. The Court, however, lacks jurisdiction to permit Hoist to file an untimely Notice of Claim. All of the alleged events concluded by July 28, 2011, when Hoist was given official notice of her termination as of April 27, 2011. Therefore, at the latest, Hoist was required to file her Notice within 90 days of July 28, 2011—a period that expired

nearly four years ago.  Likewise expired is the one-year period to seek leave to file a late notice of claim.  Therefore, Hoist's failure to satisfy the notice requirements of the Tort Claims Act bars any of her alleged tort claims against Defendants.  Accordingly, to the extent that Hoist intended to bring such claims, they must be dismissed.

### C.      Race and Gender Discriminations Claims under Title VII

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e-2.  A claim of race or gender discrimination under Title VII uses the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-05 (1974). Under that framework, a plaintiff has the burden of establishing a prima facie case of discrimination by proving (1) that he or she is a member of a protected class; (2) that he or she suffered some form of adverse employment action; (3) under circumstances giving rise to an inference of unlawful discrimination.  *Carter v. Midway Slots & Simulcast*, 511 F. App'x 125, 128 (3d Cir. 2013) (citing *Goosby v. Johnson & Johnson Med.*, 228 F.3d 313, 318 (3d Cir. 2000); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)).  "However, the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied."  *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003) (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996)).

If the plaintiff succeeds in establishing a prima facie case, then the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  If the defendant makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated nondiscriminatory rationale was "merely a pretext for discrimination, and not the real

motivation for the unfavorable job action." *Sarullo*, 352 F.3d at 797 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

       1.     <u>Gender Discrimination Claim</u>

Before the Court turns to the merits of Hoist's gender discrimination claim under Title VII, it must ensure that Hoist exhausted all required administrative remedies before bringing her claim. *See Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997) ("It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief."). With regard to employment discrimination claims, 42 U.S.C. § 2000e-5 provides that a plaintiff must file a timely Charge of Discrimination with the EEOC before filing a lawsuit. A plaintiff must then wait for the EEOC to complete its investigation of the charge and issue a right-to-sue letter before the complainant can initiate a private action. *See Burgh v. Borough Council*, 251 F.3d 465, 470 (3d Cir.2001) (describing the administrative process for discrimination claims).

After the discrimination charge is filed, "the scope of a resulting private civil action in the district court is defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . ." *Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010) (quoting *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 966 (3d Cir.1978)); *see also Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996) (dismissing gender discrimination claim where it did not fall within the scope of the initial administrative charge filed with the EEOC). This liberal construction helps ensure that potentially aggrieved plaintiffs are not foreclosed from bringing a claim due to unreasonable or incomplete investigation by the EEOC. *Hicks*, 572 F.2d at 966. The Third Circuit has explained that this scope is not necessarily limited by a complainant's "failure to check a box on an EEOC Charge Form," but

rather works to "prevent a plaintiff from 'greatly expanding an investigation simply by alleging new and different facts when she is contacted by the Commission following her charge.'" *Barzanty*, 361 F. App'x at 414 (quoting *Hicks*, 572 F.2d at 967). In particular, a charge based on discrimination against one protected class does not encompass other classes merely because the investigation would reveal that the plaintiff is a member of both of those classes. *Antol*, 82 F.3d at 1296.

Interpreting Hoist's EEOC charge liberally, her gender discrimination claim was not within the scope of the charge.[3]   Plaintiff's charge provides no hint that her termination, or any other adverse employment action, was the result of her gender. When viewed generously, the Form 5 Charge of Discrimination identifies only allegations of race discrimination, retaliation, and hostile work environment. Hoist provided no facts that suggest gender discrimination and, while not determinative, did not check the box indicating her charge was based on her sex. There is nothing within the descriptive paragraphs that would lead the EEOC to assume that there was a gender claim, particularly since two of the four people that Hoist names as subjecting her to discrimination are females. Hoist specifically and repeatedly states that her discrimination is based on "bullying, harassment, favoritism by race and retaliation," and that she has "been discriminated against because of my race (Black) and retaliation . . . ." Duran Cert. Ex. A at HOIST.EEO.0008. There is no language within the Charge that could be construed as being

---

[3] Plaintiff's charge included the following language:

> I began my employment in October 2004, in the position of Clerk Typist. Sometime later I was placed in the position of Clerk Typist.

> During the court of my employment[,] I have complained about harassment from certain supervisory and managerial employees. In April 2011, I was suspended without pay. On July 28, 2011, I was discharged.

> I believe that I have been discriminated against because of my race (Black) and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

Duran Cert. Ex. A.

analogous to a claim for gender discrimination.  *Compare Anjelino v. New York Times Co.*, 200 F.3d 73, 94-95 (3d Cir. 1999) (finding that a hostile work environment claim could proceed where the initial EEOC charge alleged that the plaintiff was subject to an "abusive atmosphere," because such a phrase is interchangeable with "hostile work environment").  Accordingly, it is not reasonable to expect an investigation into her charge to cover such a claim, nor could Defendants reasonably expect to be sued for such a claim.  Therefore, Hoist did not exhaust her administrative remedies with respect to her gender discrimination claim,[4] and it must be dismissed.

2.      Race Discrimination Claim

The Court, therefore, turns towards Hoist's racial discrimination claim under Title VII.  Defendants have moved for summary judgment on her claims, arguing that she has failed to establish a prima facie case for race discrimination; alternatively, Defendants have asserted that, even if Plaintiff has established a prima facie case of racial discrimination, she has failed to establish that their nondiscriminatory reason for the unfavorable employment decision was pretextual.

a.      *Prima Facie Case*

It is undisputed that Hoist, an African-American, has established the first prong of the prima facie case for race discrimination.  Defendants, however, contest the next two prongs for the majority of the allegedly discriminatory incidents asserted by Hoist, arguing that Hoist has either failed to establish that she suffered an adverse employment action from these incidents and

---

[4] This claim appears to relate in large part to the incident where Plaintiff received a one-day suspension for insubordination after she refused to complete a priority task for Coefer in November 2010.  Plaintiff asserts that she was unfairly punished because a male co-worker, Mr. Daniels, acted insubordinately in March 2010 and was not, to her knowledge, punished.  The Court, however, lacks jurisdiction to hear this claim for the above-mentioned reasons.

that any actual adverse employment action that occurred fails to raise an inference of discriminatory animus.  The Court now turns to these arguments.

In order to establish to a claim of racial discrimination, an adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (quoting 42 U.S.C. § 2000e-2(a)(1) and (2)). Not every "insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Id.* at 1297.

As to the third factor, a plaintiff may establish an inference of discrimination "in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 (3d Cir. 2010) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)). "More specifically, when presenting comparator evidence, on summary judgment, a plaintiff must prove that she is 'similarly situated' to her comparators and that these employees have been treated differently or favorably by their employer." *Houston v. Dialysis Clinic, Inc.*, Civ. Action No.: 13-4461(FLW), 2015 U.S. Dist. LEXIS 83151, at *12 (D.N.J. June 26, 2015) (citing *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003); *Andy v. UPS*, 2003 U.S. Dist. LEXIS 25193, at *33 (E.D. Pa. Oct. 28, 2003); *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998)).  To be "similarly situated," a comparator must be "similar in all relevant respects," including with regards to "the requirements, duties and responsibilities of the respective jobs." *Id.* at *12 (internal quotation marks and citations omitted).  Importantly, "the acts of non-

minority employees must be of 'comparable seriousness' if the failure to discharge those employees is being proffered as proof of discriminatory intent." *Taylor v. Procter & Gamble Dover Wipes*, 184 F. Supp. 2d 402, 410 (D. Del. 2002), *aff'd*, 53 F. App'x 649 (3d Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 804); *see also Houston*, 2015 U.S. Dist. LEXIS 83151, at *13 (explaining that a plaintiff must demonstrate that "the acts of the similarly situated employees were of a 'comparable seriousness'" in order to raise an inference of discrimination based on comparator evidence); *Dill v. Runyon*, Civil Action No. 96-3584, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. Apr. 2, 1997) ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting *Anderson v. Haverford College*, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

In her TAC, and throughout her moving papers, Hoist has pointed to a series of events which she asserts substantiates her claims for race discrimination. Hoist, however, has failed to provide sufficient evidence to establish a prima facie case for the majority of these incidences. It is not disputed that Hoist's termination constituted an adverse employment action; however, other than this termination, the incidents that Hoist is relying on largely fail to qualify as adverse employment actions under the law. For example, there are several incidences where there was no action taken by the Defendants with regard to Plaintiff at all, and certainly no action that could constitute a significant change in Hoist's employment status. Specifically, with regard to the November 5, 2010 safe deposit box incident and the November 16, 2010 lobby incident involving a visitor Hoist failed to assist, Hoist was never disciplined—either formally or informally—for these events. Rather, Hoist testified that she was just concerned that something

26

could have happened; this concern, however, does not constitute an adverse employment action. Similarly, Hoist has asserted that her request to change her working hours was denied while a Caucasian female co-worker's request was approved, indicating a disparate impact.  Hoist's request, however, was approved; even if it had been denied, such a denial would not constitute an adverse employment action as it would not materially change her working conditions.

There are also several incidences in which Plaintiff was reprimanded or disciplined, but the resulting effect did not change Hoist's employment status or condition in such a way to appropriately be considered an adverse employment action.  For example, with regard to the Workplace Violence Complaints filed against her in March 2010, the OLR's investigation determined that Plaintiff failed to conduct herself appropriately in the workplace and therefore proceeded to give her a written warning, reminding Hoist to conduct herself in a "courteous and professional manner." Likewise, Hoist received a Record of Counseling for leaving work early without prior approval on January 4, 2011.[5]  These reprimands, however, did not result in Hoist having her hours or type of work changed, or result in Hoist either receiving a decrease in wages or being denied a pay raise or promotion.  Accordingly, they "did not effect a material change in the terms and conditions of her employment," and do not qualify as adverse employment actions. *Urey v. Grove City College*, 94 F. App'x 79, 81 (3d Cir. 2004); *see also Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. Pa. 2001) (finding that written reprimands did not constitute an adverse employment action where the plaintiff failed to show "that these written reprimands affected the terms or conditions of his employment"); *Heuschkel v. McCulley*, Civil Action No. 05-5312(NLH), 2008 U.S. Dist. LEXIS 22143, at *12 (D.N.J. Mar. 19, 2008) (finding that a

---

[5] Hoist does not dispute this incident, but rather asserts that it was disparate impact because she and the rest of her office had, on prior occasions, been allowed to utilize their lunch period at 4:00 p.m.  This Record of Counseling was based on Plaintiff's violation of a DEP policy, as she did not wait for supervisory approval before leaving early. Therefore, there was a valid and legitimate business reason for this Record of Counseling, even if it could be considered an adverse employment action.

written reprimand did not constitute an adverse employment action on the basis that such reprimand "could" be used in future progressive discipline because it did not actually materially change her employment terms or conditions).

 Similarly, Plaintiff's 2010 PES report does not constitute an adverse employment action. Plaintiff asserts that a comment within the PES, in which Coefer justified why Hoist did not pass the "Organizational Citizenship" category, to be discriminatory.  She also asserts that Coefer's reference to the Workplace Violence Complaints filed against Hoist in his addendum was improper because the Complaint had been found unsupported.[6]  Hoist, however, received an overall rating of "Satisfactory" on her PES, and the comment did not deprive Hoist of any employment opportunities, or otherwise affect her status as an employee.  Hoist has only made the unsupported statement that the PES, which states that Plaintiff is an efficient worker but should be "more respective [sic] and courteous to fellow co-workers and staff," could have been used to hurt her chances of getting other job opportunities.  There is no claim or evidence that it did affect her chances of being promoted or receiving a raise, and Hoist does not claim that the PES was used as a basis for progressive discipline.  Therefore, the PES does not constitute an adverse employment action.  *See Heuschkel*, 2008 U.S. Dist. LEXIS 22143, at *12. Correspondingly, Hoist's allegations that she was bullied during her meeting with Grennier and her union representative to discuss the PES does not constitute an adverse employment action. Hoist's claims, in which her supervisor "challenged" the allegations of Hoist and her union

---

[6] It should also be noted that Coefer's addendum was a response to Hoist's response to her Interim PES, as it was Hoist herself that initially references the Workplace Violence Complaints filed in the OLA.  Coefer merely states that he filed the Complaint on behalf of his staff, who had approached him about Hoist's treatment.  It is illogical to claim that Coefer was being discriminatory by responding to the Complaints that Hoist herself first referenced. Further, Coefer later redacted the portion of his addendum that referenced the Workplace Violence Complaints, meaning that the offending comments were removed and never made part of Plaintiff's official personnel file. These comments, therefore, could not affect the terms, conditions, or status of Plaintiff's employment.

representative during the meeting, fail to indicate any change to her employment terms or conditions as a result of this meeting.

More troublesome for Plaintiff, however, is the lack of evidence purporting to establish an inference of race discrimination.  "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo*, 352 F.3d at 798 (quotation and citation omitted).  For example, Plaintiff has asserted that management's failure to transfer her out of OPRA constituted discrimination.  Plaintiff, however, has failed to produce any evidence indicating that her denial of transfer had anything to do with her race.  Rather, Plaintiff applied for a transfer in the "lateral mobility process," and was given equal consideration with all other employees who requested a transfer.  Additionally, Coefer attempted to help Plaintiff in her request to transfer by reaching out twice to Human Resources.  The second time he reached out to Human Resources, he sent an electronic communication to Ms. Ewalt, who is the Director of the Office of Human Resources, requesting that Hoist receive expedited consideration for her request for a lateral transfer.  He was told, however, that Hoist's request would be given "equal consideration" with the other employees.   It is also notable that Plaintiff had been trying to transfer out of OPRA since 2009, before the incidences of purported discrimination occurred.  Plaintiff, therefore, has failed to establish that the denial of her transfer had any connection with her race.

Hoist has also pointed to the 2010 Workplace Violence Complaints as examples of disparate impact, because she, an African-American, was disciplined, while Ms. Clayton, a Caucasian, was not disciplined.  However, the record shows that the findings in both Ms. Clayton's and Hoist's Workplace Violence Complaints were substantially the same.  After conducting an investigation, the OLR found neither Complaint to be substantiated, reminded

both Hoist and Ms. Clayton to conduct themselves in a "courteous and professional manner," and stated that the letter served as a written warning for both.  Therefore, the same exact remedial action was taken in regard to both Workplace Violence Complaints; accordingly, Hoist has failed to establish she was treated any differently from Ms. Clayton because of her race.

Likewise, Hoist has alleged that she was discriminated against because she was not asked to join a training session regarding a new process for handling money in the office by Coefer.  Rather, she alleges that Coefer invited three other employees, two of whom are Caucasian and one of whom is Hispanic.  This event, however, occurred after Hoist had requested to be removed of her safe-keeper responsibilities—a request which was granted by management.  Accordingly, there can be no causal connection between Hoist's race and her exclusion from this training session.

Plaintiff's sole remaining basis for her race discrimination claim is her suspension and ultimate termination.[7]  As these are clearly adverse employment actions, the only real issue of contention relates to whether they raise an inference of discriminatory animus.  In that regard, Plaintiff attempts to establish an inference of discrimination through purportedly favorable treatment of a similarly situated employee, to wit, Ms. Clayton.  Specifically, Plaintiff asserts that Ms. Clayton was a female Caucasian co-worker of hers, who was also supervised by Coefer and Grennier.  After the altercation between Ms. Clayton and herself on April 21, 2011, Hoist asserts that the non-termination of Ms. Clayton shows discriminatory intent on the part of Defendants.

After reviewing the evidence as it relates to the "comparator" raised by Plaintiff, the Court concludes that Ms. Clayton's circumstances are not sufficiently similar to Plaintiff's

---

[7] Because the suspension was without pay, it is an adverse employment action.  *See Jones v. SEPTA*, No. 14-3814, 2015 U.S. App. LEXIS 14094, at *8-9 (3d Cir. Aug. 12, 2015) (explaining that, while a paid suspension cannot constitute an adverse employment action, a suspension without pay does).

circumstances so as to create an inference that Plaintiff was terminated as a result of racial discrimination. Notably, while Ms. Clayton was obviously an active participant in the April 21 altercation, she was accused of misconduct that is not of comparable seriousness to the misconduct attributed to Plaintiff in this case. With regard to the April 21 altercation, Hoist was determined to have been the instigator in the altercation and that she could have provoked a physical confrontation by yelling, "If you see a bitch, slap a bitch," within inches of Ms. Clayton's face. Eye witnesses to the incident, including a visitor to the office, corroborated that Hoist was the aggressor, that she leaned into Ms. Clayton's personal space, and that she repeatedly kept yelling, "If you see a bitch, slap a bitch" at Ms. Clayton. Hoist herself testified that she yelling the aforementioned phrase repeatedly, and that she initiated the altercation by confronting Ms. Clayton in her cubicle, and that she stood over Ms. Clayton yelling while Ms. Clayton remained seated. While Ms. Clayton clearly played a role in the altercation— specifically, Ms. Clayton called Hoist a "bitch" and kept yelling at Hoist to get out of her face— the differences in Hoist's conduct and Ms. Clayton's conduct in the altercation distinguishes Defendant's treatment of them for it. *See Jones*, 2015 U.S. App. LEXIS 14094, at *9-10 (finding that a "materially different" distinction between the misconduct of an employee in a protected class and an employee outside that class precludes an inference that the treatment of the employee in the protected class was motivated by discrimination).

Because of Hoist's role as the aggressor of the incident and because Hoist could have provoked Ms. Clayton into a physical confrontation by yelling in her face, Defendants determined that Hoist had violated the Employee Code of Conduct by engaging in conduct unbecoming of a public employee, and decided termination was appropriate. Ms. Clayton was likewise disciplined, but because of her lesser role, was given a written warning for her use of

language.  Therefore, based on these circumstances, Ms. Clayton is not similarly situated to Plaintiff, because her conduct and involvement in the altercation were clearly different than that of Hoist.  These differences are what ultimately justify the different penalties that the DEP ultimately imposed on the two women.  *See  Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 223 (3d Cir. Pa. 2009) (explaining that a similarly situated employee must be shown to have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).  In other words, because the acts of Ms. Clayton, the non-minority employee, were not of "comparable seriousness" to Plaintiff's conduct, the failure to discharge Ms. Clayton does not establish proof of discriminatory intent by Defendants. *McDonnell Douglas*, 411 U.S. at 804; *see also Opsatnik*, 335 F. App'x at 223.

In sum, Plaintiff has failed to establish a prima facie case of discrimination.  The majority of the asserted incidents do not constitute adverse employment action for the purposes of a Title VII discrimination analysis.  Plaintiff has failed to proffer any evidence that establishes that the few incidents that could be considered an adverse employment action occurred under circumstances that allow for an inference of discrimination.  While Plaintiff has attempted to show an inference of racial discrimination with regard to the circumstances giving rise to her termination through comparator evidence, the co-worker that Plaintiff has compared herself to is not sufficiently situated to Plaintiff to treat her as a comparator and raise an inference of discrimination.  Nonetheless, even assuming Hoist could establish a prima facie case of discrimination, she has failed to rebut Defendants' legitimate business reason for her termination.

        b.     *Burden Shifting*

As discussed, if a plaintiff succeeds in establishing a prima facie case for race discrimination, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination.  If a plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *See Sarullo*, 352 F.3d at 799.  As the Third Circuit has noted, this burden is "relatively light" and does not oblige the employer to prove that it was actually motivated by the tendered reason.  *Fuentes*, 32 F.3d at 763.

Here, Defendants proffer that they terminated Plaintiff based on a legitimate business reason; specifically, they terminated Plaintiff following the April 21, 2011 altercation with Ms. Clayton because they determined that Hoist instigated the altercation, was the aggressor in the altercation, and could have provoked Ms. Clayton into a physical altercation by yelling, "If you see a bitch, slap a bitch," several times within inches of Ms. Clayton's face.  Such conduct was found to violate N.J. A.C. 4A:2-2.3(a)(6), as it qualified as conduct unbecoming of a public employee.  Based on this violation of the DEP Employee Code of Conduct, the DEP decided to terminate Plaintiff.  As Defendants have satisfied their burden of establishing a legitimate, non-discriminatory reason for Plaintiff, the burden now shifts to Plaintiff to show that Defendants' proffered nondiscriminatory reasons are, in actuality, a pretext for invidious race discrimination.

At the summary judgment stage, there are two ways in which a plaintiff may demonstrate pretext.  "First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 430 (3d Cir. 2013).  Alternatively, the plaintiff may survive summary judgment by tendering evidence that "allows the factfinder to infer that discrimination was more

likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes*, 32 F.3d at 762; *Burton*, 707 F.3d at 430-31 ("[T]he plaintiff may also defeat summary judgment by pointing to evidence that indicates that the employer acted with discriminatory animus.").  It is not enough for the plaintiff to "simply show that the employer's decision was wrong or mistaken"; rather, the plaintiff "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'"  *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (alteration in original) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995)).

In order to establish pretext, Plaintiff alleges that Ms. Clayton was the instigator, and that Ms. Clayton called Plaintiff a "bitch" during the altercation.  Plaintiff, it appears, hopes to show that Defendants inconsistently apportioned punishments by giving her, a minority, a much harsher punishment than Ms. Clayton, a non-minority co-worker.  The record, however, fails to support this argument.  The hearing officers at both Plaintiff's pre-suspension hearing and her disciplinary hearing determined that Hoist was the instigator of the altercation, and that she was the more aggressive party.  Both hearing officers also found that Hoist essentially invited Ms. Clayton to physically retaliate against her by invading her personal space and yelling, "If you see a bitch, smack a bitch" several times.  These determinations were based on significant evidence that was corroborated by numerous witnesses to the incident, including some outside parties.  Hoist herself has admitted that she went into Ms. Clayton's cubicle to confront her regarding her alleged inquiries into Plaintiff's whereabouts the prior day.  She also admits that she stood over Ms. Clayton, yelling the aforementioned phrase at her.

34

It appears that Hoist feels that, because Ms. Clayton allegedly inquired about her whereabouts, Ms. Clayton instigated the altercation.  The hearing officer, however, found that Ms. Clayton's inquiry about Plaintiff's whereabouts was not inappropriate because the front desk of the OPRA office had to be manned at all times.  Once management relayed that Hoist was given permission to leave, there is no evidence that Ms. Clayton made an issue about it.  It was, rather, Plaintiff who initiated the altercation by deciding to confront Ms. Clayton the next day about her inquiry, and then proceeded to escalate the altercation by standing over Ms. Clayton and yelling at her in a way that could provoke a physical confrontation.  Plaintiff not only engaged in this action in front of her coworkers, but also did this in front of visitors to the office.

While Plaintiff asserts that Ms. Clayton was unpunished for this incident, this is not true.  Ms. Clayton received a written warning for her use of language during this altercation.  And while Ms. Clayton was clearly involved in the altercation, her behavior is not comparable to Plaintiff's conduct during the altercation, as discussed earlier.  Ms. Clayton did not approach Hoist with the intention to start a verbal or physical altercation, she remained seated at all times during the altercation, and she never threated Hoist.

Overall, without proof that someone similarly situated was treated more favorably, Hoist is left only with her subjective belief that race played a role in the DEP's employment decisions.  She presents no discriminatory statements by Defendants, or evidence of discriminatory motive to support her allegations.  She has offered no rebuttal to DEP's proffered (conduct-related) reason for terminating her employment, other than her feeling that she was treated unfairly.  Hoist, however, has corroborated the essence of the incident that led to her termination, and the Court will not second guess DEP's intolerance for Hoist's actions, which were clearly inappropriate for the office place.  Plaintiff has offered no other evidence that could plausibly

establish pretext, nor did the Court find any such evidence in its review of the record.  Overall, Hoist's "subjective belief that race played a role in these employment decisions . . . is not sufficient to establish an inference of discrimination."  *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 135 (3d Cir. 2014).  Accordingly, Plaintiff has failed to show there is any genuine issue of material fact that Defendants' proffered reason for terminating Plaintiff was a pretext for a racially discriminatory purpose. Thus, summary judgment is granted in favor of Defendants on Plaintiff's Title VII race discrimination claim.

### D.    Retaliation Claim Under Title VII

In her TAC, Plaintiff claims that she was retaliated against for making complaints about her work environment.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) she engaged in a protected activity under Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 320 (3d Cir. 2008).  Critically for this case, the first element of a Title VII retaliation claim protects only "those who oppose discrimination made unlawful by Title VII." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir.2006); *see also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 134 (3d Cir. 2006) ("Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII."). Accordingly, "[n]ot every complaint or report entitles its author to protection from retaliation under Title VII." *Davis v. City of Newark*, 417 F. App'x. 201, 202-03 (3d Cir. 2011) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (noting that Title VII does not "set forth a general civility code for the American workplace" (internal quotation marks

omitted))).  Rather, "only complaints about discrimination prohibited by Title VII - that is, discrimination on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2- constitute 'protected activity.'  Thus, for a complaint to amount to 'protected activity,' it must implicate an employment practice made illegal by Title VII."  *Id.* (internal citation omitted) (citing *Curay-Cramer*, 450 F.3d at 135).  Because Title VII is not a code for general civility, "a general complaint of unfair treatment does not translate into a charge of [retaliation]."  *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995); *see also Burlington N. & Santa Fe Ry.*, 548 U.S. at 68.

Accordingly, the Third Circuit has held that an employee did not engage in protected activity under Title VII where the employee wrote a letter to the human resources department "complain[ing] about unfair treatment in general and express[ing] his dissatisfaction about the fact that someone else was awarded the position" because the employee did not "explicitly or implicitly allege" that that the alleged unfairness was due to his membership in a protected category under Title VII.  *See Barber*, 68 F.3d at 702.  Likewise, the Third Circuit has found that an employee who alleges "a long history of what he perceives to be differential treatment by his supervisors" does not sufficiently establish that the employee engaged in "protected activity" under Title VII.  *See Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009).

In support of her claim, Plaintiff has failed to offer any evidence or proof that she engaged in protected activity that caused DEP to retaliate against her.  In her TAC and moving papers, Plaintiff has offered up a series of events that she asserts establishes retaliation under Title VII.  For example, she states that her co-workers and supervisors made defamatory statements against her and harassed her, that her supervisors punished her more severely than her co-workers, that Coefer inappropriately referenced the Workplace Violence Complaint filed

against her in the 2010 PES, and that she was denied a transfer despite the "unhealthy work environment."[8]  *See* Pl.'s Br. at 11-12.  These allegations, however, do not relate to any protected activity that Plaintiff engaged in, for which the DEP retaliated against her.

After reviewing the record, the Court cannot find a single complaint Plaintiff made—whether informal or formal—concerning an employment practice that she found to be discriminatory towards her because of her race.   Rather, even viewing the record in the most favorable light to Hoist, Plaintiff's complaints to her supervisors and to management only show a general feeling of unfair treatment by her supervisors and her co-workers.  As in *Barber*, there is no explicit or implicit allegation that this unfairness stems from a discriminatory animus.  It is not enough that Plaintiff complained about a history of differential treatment by her supervisors and an uncivil work environment, *see Davis*, 417 F. App'x at 203; *Ferra*, 324 F. App'x at 192; unless Hoist linked these complaints to an employment practice prohibited under Title VII, she did not engage in protected activity for the purposes of retaliation.  Even when construing all facts and logical inferences in favor of Plaintiff, she has failed to show any issue of material fact as to her retaliation claim.[9]  Accordingly, judgment must be entered for Defendants on Plaintiff's Title VII retaliation claim.

### E.    Hostile Work Environment Claim under Title VII

Finally, Plaintiff has brought a claim for hostile work environment under Title VII.  In order to establish a hostile work environment claim under Title VII, Plaintiff must show that (1)

---

[8] Plaintiff has alleged elsewhere that Coefer filed the March 2010 Workplace Violence Complaint against her as retaliation after she verbally complained about the environment in the workplace, particularly as it related to Ms. Clayton's behavior towards her.  The record, however, does not support this contention.  The March 2010 Workplace Violence Complaint had already been filed by Coefer before Hoist verbally complained to him, so his Complaint could not have been retaliatory.  Further, and significantly for Title VII purposes, Plaintiff's verbal complaints do not reference any conduct that reflects a discriminatory animus.

[9] A retaliation claim is subject to the same burden-shifting analysis applied in Title VII discrimination claims.  *See Moore*, 461 F.3d at 342.  Accordingly, judgment would still be entered in favor of Defendants even had Plaintiff established that she engaged in a protected activity because, as discussed in Section III.C, Plaintiff has failed to establish that Defendants' preferred, non-discriminatory reason for her termination was actually a pretext.

she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability.  *See Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)).

"The threshold issue in a Title VII hostile work environment claim is whether the plaintiff has 'produced evidence of intentional discrimination based on' her race."  *Sanchez v. Tricorp Amusements, Inc.*, Civil Action No. 08-4554 (FLW), 2010 U.S. Dist. LEXIS 125287, at *34 (D.N.J. Nov. 29, 2010) (quoting *Waite v. Blair, Inc.*, 937 F. Supp. 460, 468 (W.D.Pa.1995)). It is well-established that Title VII does not mandate a "general civility code" in the workplace, and ordinary tribulations of the workplace do not, by themselves, support a hostile work environment claim.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Indeed, "[t]he mere fact that a work environment may prove to be intolerable to a particular employee does not necessarily implicate Title VII, since the civil rights laws do not guarantee a working environment free of stress."  *Waite*, 937 F. Supp. at 468 (citing *T. Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, 475 U.S. 1082 (1986)).  Rather, Title VII protects an employee from racial discrimination in the workplace, which includes freedom from a racially-hostile work environment.  If the workplace is unpleasant, or even revolting, for any reason other than hostility generated because on account of an employee's membership in a protected class under Title VII, then the hostile environment fails to implicate a federal claim. "In short, personality conflicts between employees are not the business of the federal courts."  *Id.* (quoting *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994)); *see also Fichter*

*v. AMG Res. Corp.*, 528 F. App'x 225, 231 (3d Cir. 2013) ("Title VII does not guarantee a utopian workplace." (internal quotation marks omitted)).

Upon examination of Hoist's list of complaints, the Court must conclude that, while the incidents Hoist experienced may have been personally upsetting or offensive to her, Hoist has failed to demonstrate a discriminatory animus. Plaintiff's complaints concern allegations that she started receiving poor evaluations; that she started to be disciplined for things while her co-workers were "merely overlooked" for doing similar things; that her co-workers and supervisors treated her inconsiderately and/or disrespectfully and said "defamatory" things about her; that her supervisors did not take her seriously and/or did not address her complaints; and that she was not transferred. After reviewing the record, there is simply no evidence of discriminatory treatment in these assertions aside from the fact that Hoist happens to be African-American. Plaintiff has not provided any evidence that anyone in the workplace mentioned her race, called her derogatory names based on her race, or even referenced her race. *See Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852, 865 (D.N.J. 2002) (dismissing claim based upon failure to produce any evidence "that the facially neutral conduct of [plaintiff's] supervisors and co-workers masked a discriminatory intent"). In her own complaints, she only references her frustrations with her workplace because of personality conflicts she was having with her co-workers and her supervisors. Indeed, when Plaintiff met with Dr. Straus about her issues in the workplace, she only spoke of certain personality issues she had with Coefer, and how she felt he was not understanding of her because she behaves socially differently from her fellow co-workers. She never once mentioned any feelings that this alleged conflict was based on any sort of discrimination.

Plaintiff has cited to the results of the investigation into her May 2010 Workplace Violence Complaint, in which the OLR concluded that, while the incidents within the Complaint did not constitute workplace violence, they did create a hostile work environment.  Plaintiff argues that this shows that this letter shows that her claim has merit, because the OLR "admitted" that she was a victim of a hostile work environment.  *See* Pl.'s Br. at 15.  This argument, however, misconstrues the OLR's investigation and resulting determination.  Plaintiff, in her Workplace Violence Complaint, complained of generalized workplace violence, relating to her issues with Ms. Clayton and her impression that Coefer was not addressing her complaints.  There is no reference, either implicitly or explicitly, to any discriminatory animus in her complaint, or in the OLR's findings.[10]  While the OLR found that there was a hostile work environment, this finding only dealt with the personality conflicts occurring in the office of which Plaintiff complained.  Title VII simply is not implicated by such complaints of personality conflicts between employees, or by an unhappy working environment for an employee.  *See Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006) ("The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace.").  Accordingly, the OLR's determination of a hostile work environment based on its investigation into Plaintiff's Workplace Violence Complaint fails to create an issue of material fact as to Plaintiff's Title VII claim for hostile work environment.

Moreover, even assuming Hoist could establish that she suffered intentional discrimination because of her race, her hostile work environment claim would still fail because it is clear that the incidents she has identified do not constitute the kind of severe or pervasive

---

[10] It is also notable that the OLR does not investigate claims of discrimination based on an individual's status in a protected category.  Rather, such investigations are within the province of DEP's Equal Employment Office ("EEO").  If, during the court of the OLR's investigation, Plaintiff had alleged that the conduct she was experiencing from her co-workers was due to her race and/or gender, the matter would have been referred to the EEO.  *See* Certification of Melanie L. Armstrong ("Armstrong Cert.") ¶¶ 2, 4.

harassment required by Title VII. *See Harris*, 510 U.S. at 21-22.  Such harassment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citation omitted).  This conduct must be so severe or pervasive as to create an *objectively* hostile work environment.  *See Weston*, 251 F.3d at 426. Because Title VII does not mandate the existence of a copasetic workplace, evidence of "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough [because] they do not 'permeate' the workplace and change the very nature of the plaintiff's employment." *Jensen*, 435 F.3d at 451.  In determining whether harassment is sufficiently severe or pervasive to give rise to a Title VII action, the Court is mindful that it must look at all the surrounding circumstances, "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris*, 510 U.S. at 23.

When applying these principles here, the Court is compelled to conclude that no reasonable jury could find that Hoist experienced racial harassment so severe or pervasive that it "alter[ed] the conditions of [her] employment and create[d] an abusive environment."  *Jensen*, 435 F.3d at 451.  While Hoist may have been offended by the way she was treated by her co-workers and frustrated by the way management treated her, the harassment she asserts she feels was not particularly frequent, and certainly was not physically threatening or humiliating. Rather, it appears that Hoist's sometimes extreme reactions to incidences in the workplace were, at times, unreasonable and a result of her (self-described) tendency to become emotional and angry in the workplace. Indeed, it is hard to conceive how the alleged harassment could have had

any real interference with her work performance.  In short, all of the alleged incidents, taken together and viewed in the light most favorable to Hoist, fail to establish that the workplace at OPRA was "permeated with discriminatory intimidation, ridicule, and insult" such that the nature of Hoist's employment was changed.  *Morgan*, 536 U.S. at 116.

Overall, Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).  Plaintiff has failed to show a single incident of such discriminatory conduct. Therefore, the Court finds insufficient evidence on this record to create a genuine issue as to whether Plaintiff suffered intentionally discriminatory treatment, much less discrimination which was pervasive and regular.  Given these crucial deficiencies, Hoist's hostile environment claim cannot survive summary judgment.  Accordingly, the Court will enter judgment for Defendants on this claim.

**IV.**     **Conclusion**

For the aforementioned reasons, Plaintiff's three Motions to Compel are denied. Plaintiff's Motion for an Extension of Time to file a summary judgment motion is granted, and Plaintiff's Motion for Summary Judgment is denied in its entirety.  Defendants' Motion for Summary Judgment is granted.  An appropriate order accompanies this Opinion.

/s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.

Dated:  August 13, 2015

43